## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FEDERAL TRADE COMMISSION

and

COMMONWEALTH OF
PENNSYLVANIA,

           Plaintiffs,

        vs.

PENN STATE HERSHEY
MEDICAL CENTER

and

PINNACLEHEALTH SYSTEM,

         Defendants.

Civil Action No.: 1:15-cv-2362

~~FILED UNDER SEAL~~

FILED
HARRISBURG, PA

DEC 0 9 2015

MARIA E. ELKINS, CLERK
Per_____

## COMPLAINT FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission"), by its

undersigned attorneys, and the Commonwealth of Pennsylvania, acting by and

through its Office of Attorney General, petition this Court, pursuant to Section

13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b); and

Section 16 of the Clayton Act, 15 U.S.C. § 26, for a temporary restraining order

and preliminary injunction enjoining Penn State Hershey Medical Center ("Hershey") from consummating its proposed merger (the "Merger") with PinnacleHealth System ("Pinnacle"). Absent such provisional relief, Hershey and Pinnacle (collectively, "Defendants") would be free to consummate the Merger on 12:01 a.m. on December 10, 2015.

Plaintiffs require the aid of this Court to maintain the *status quo* during the pendency of an administrative proceeding on the merits scheduled to begin on May 17, 2016, which the Commission already has initiated pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45. That administrative proceeding will determine the legality of the Merger, subject to judicial review by a federal Court of Appeals, and will provide the parties to this proceeding a full opportunity to conduct discovery and present testimony and other evidence regarding the likely competitive effects of the Merger.

## NATURE OF THE CASE

1.     This is an action to temporarily restrain and preliminarily enjoin the consummation of the merger between Hershey and Pinnacle, the two largest health systems in the greater Harrisburg, Pennsylvania area. If allowed to proceed, the Merger would create a dominant provider of general acute care ("GAC") inpatient

hospital services in the Harrisburg area. The Merger is likely to substantially

lessen competition for healthcare services in Harrisburg, Pennsylvania, and its

surrounding communities, leading to increased healthcare costs and reduced

quality of care for over 500,000 local residents and patients.

2.     Today, Hershey owns and operates one GAC hospital in the

Harrisburg area, while Pinnacle operates three GAC hospitals. Hershey and

Pinnacle operate the only three hospitals located in Dauphin County. Both

Hershey and Pinnacle are high-quality health systems that, with limited exceptions,

offer an overlapping range of GAC inpatient hospital services ("GAC services"),

including primary, secondary, tertiary, and quaternary services.

3.     Hershey and Pinnacle are close competitors for GAC services in the

Harrisburg area. Hershey and Pinnacle vigorously compete on price, quality of

care, and services provided, both for inclusion in commercial health plan networks

and to attract patients from one another. The rivalry between Hershey and

Pinnacle has benefited local patients with lower healthcare costs and increased

quality of care. The Merger would eliminate this significant head-to-head

competition between Hershey and Pinnacle and its related benefits.

4.     The Merger would substantially lessen competition in the market for

GAC services sold to commercial health plans in an area roughly equivalent to a

four-county region comprised of the Harrisburg Metropolitan Statistical Area (Dauphin, Cumberland, and Perry Counties) plus Lebanon County (the "Harrisburg Area").

5.     The only significant competitor of the Defendants in the Harrisburg Area is Holy Spirit Hospital ("Holy Spirit"), which is a smaller community hospital located in eastern Cumberland County that offers a more limited range of services than Hershey or Pinnacle.  There are two other hospitals located on the outskirts of the Harrisburg Area.  They are even smaller community hospitals that offer a more limited range of services than Holy Spirit and a much more limited range of services than the Defendants.  Neither of these hospitals meaningfully constrains Hershey or Pinnacle.

6.     Post-Merger, the combined entity will account for approximately 64% of all GAC services in the Harrisburg Area.  Using the Herfindahl-Hirschman Index ("HHI") to measure market concentration, the post-Merger HHI would be approximately 4,500 with an increase of approximately 2,000 points.  This high market share and corresponding high concentration level render the Merger presumptively unlawful under the relevant case law and likely to increase market power—by a wide margin—under the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines").

4

7.     The Merger would substantially increase the combined entity's bargaining leverage in negotiations with commercial health plans. The combined entity would be able to exercise market power by raising prices and reducing quality and services, ultimately harming Harrisburg Area residents and patients.

8.     Entry or expansion by other providers of the relevant services is unlikely to occur, much less in a manner that is timely, likely or sufficient to deter or mitigate the loss of price and non-price competition in the near future.

9.     Finally, the Defendants' efficiency claims are overstated, speculative, unverifiable, not merger-specific, or result from an anticompetitive reduction in output, quality, or services, and are largely non-cognizable. Any cognizable efficiency claims are insufficient to offset the substantial competitive harm the Merger is likely to cause.

10.     On December 7, 2015, by a 4-0 vote, the Commission found reason to believe that the Merger would violate Section 7 of the Clayton Act and Section 5 of the FTC Act.

11.     A temporary restraining order enjoining the Merger is necessary to preserve the Court's ability to afford full and effective relief after considering the Commission's application for a preliminary injunction. Preliminary injunctive relief is imperative to preserve the *status quo* and protect competition during the

Commission's ongoing administrative proceeding.  Allowing the Merger to proceed would harm consumers and undermine the Commission's ability to remedy the anticompetitive effects of the Merger if it is ultimately found unlawful after a full trial on the merits and any subsequent appeals.

## JURISDICTION AND VENUE

12.    This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b); Section 16 of the Clayton Act, 15 U.S.C. § 26; and 28 U.S.C. §§ 1331, 1337, and 1345.  This is a civil action arising under Acts of Congress protecting trade and commerce against restraints and monopolies, and is brought by an agency of the United States authorized by an Act of Congress to bring this action.

13.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

Whenever the Commission has reason to believe –

(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public – the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such

act or practice. *Upon a proper showing that weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest*, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond . . . , (emphasis added).

14.    In conjunction with the Commission, the Commonwealth of Pennsylvania brings this action for a preliminary injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain Hershey and Pinnacle from violating Section 7 of the Clayton Act, 15 U S C § 18, pending the Commission's administrative proceeding. The Commonwealth of Pennsylvania has the requisite standing to bring this action because the Merger would cause antitrust injury in the market for GAC services sold to customers within its state.

15.    Defendants are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12. Defendants also are, and at all relevant times have been, engaged in commerce in the Commonwealth of Pennsylvania.

16.    Defendants transact substantial business in this district and the Commonwealth of Pennsylvania and are subject to personal jurisdiction therein. Venue, therefore, is proper in this district under 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 53(b).

17.   The Merger constitutes a transaction subject to Section 7 of the Clayton Act, 15 U.S.C. § 18.

## THE PARTIES AND THE PROPOSED MERGER

18.   Defendant Hershey is a not-for-profit healthcare system headquartered in Hershey, Pennsylvania in Dauphin County.   The system includes the Milton S. Hershey Medical Center ("Hershey Medical Center"), a GAC academic medical center affiliated with the Penn State College of Medicine, and the Penn State Hershey Children's Hospital (located on the Hershey Medical Center campus and the only children's hospital in the Harrisburg Area).

19.   The Hershey Medical Center has 551 licensed beds (125 of which are located at the Children's Hospital).   It employs approximately 804 physicians. Hershey offers a full range of GAC services, from primary care to quaternary services.   It offers quaternary services such as heart transplants and operates a state-designated Level I Trauma Center for pediatrics and adults.   In fiscal year 2014, on a system-wide basis, Hershey generated approximately $1.4 billion in revenue and had approximately 29,000 inpatient discharges.

20.   Defendant Pinnacle is a not-for-profit healthcare system headquartered in Harrisburg, Pennsylvania.   Pinnacle operates three GAC hospitals in the Harrisburg Area.   Pinnacle's Harrisburg Hospital and Community General

8

Osteopathic Hospital are located in Dauphin County and Pinnacle's West Shore Hospital, which opened in May 2014, is located in eastern Cumberland County.

21.     Pinnacle's combined system has 662 licensed beds, which are divided among its three GAC hospitals. Pinnacle offers a full range of GAC services, from primary care to quaternary services, excluding only a limited number of quaternary services. Harrisburg Hospital, which is Pinnacle's flagship teaching hospital, has a Level III neonatal intensive care unit and performs high-level services such as kidney transplants. Pinnacle's CardioVascular Institute is considered one of the leading cardiology programs in Pennsylvania. In 2014, Pinnacle generated approximately $850 million in revenue and had more than 35,000 inpatient discharges.

22.     In June 2014, Hershey and Pinnacle signed a letter of intent pursuant to which they agreed to explore the possibility of combining their assets. In March 2015, the Defendants' boards approved moving forward with the transaction. Although the final merger documents have not yet been signed, pursuant to the letter of intent, the transaction would be structured as a membership substitution by which the new entity would become the sole member of both Hershey and Pinnacle, and Hershey and Pinnacle will have equal representation on the new entity's board of directors.

9

## THE RELEVANT SERVICE MARKET

23.    The relevant service market in which to analyze the effects of the Merger is GAC inpatient hospital services sold to commercial health plans and their members.  This service market encompasses a broad cluster of medical and surgical diagnostic and treatment services offered by both Hershey and Pinnacle that require an overnight hospital stay.

24.    Although the Merger's likely effect on competition could be analyzed separately for each of the hundreds of affected medical procedures and treatments, it is appropriate to evaluate the Merger's likely effects across this cluster of services because the services are offered to Harrisburg Area patients under similar competitive conditions, by similar market participants.  There are no practical substitutes for this cluster of GAC services.

## THE RELEVANT GEOGRAPHIC MARKET

25..   The relevant geographic market in which to analyze the effects of the Merger is the Harrisburg Area, which is an area roughly equivalent to the Harrisburg Metropolitan Statistical Area (Dauphin, Cumberland, and Perry Counties) and Lebanon County.

26.    The appropriate geographic market in which to analyze the Merger is the area in which consumers can practicably find alternative providers of the

service. The test from the Merger Guidelines used to determine the boundaries of the geographic market is whether a hypothetical monopolist of the relevant services within that geographic area could profitably negotiate a small but significant and non-transitory increase in price (here, reimbursement rates for GAC services). If so, the boundaries of that geographic area are an appropriate geographic market.

27.    In general, patients choose to seek care close to their homes or workplaces for their own convenience and that of their families because it takes less time to travel to a hospital that is nearby and it is easier to arrange for transportation and visitation. Residents of the Harrisburg Area strongly prefer to, and do, obtain GAC services locally. Moreover, residents of the Harrisburg Area who require emergency hospital services seek such services within the Harrisburg Area. They would not travel outside of the Harrisburg Area for such emergency services without jeopardizing their health and well-being.

28.    Evidence from multiple sources shows that an overwhelming percentage of commercially insured residents of the Harrisburg Area seek GAC services within the Harrisburg Area.

29.    Hospitals outside the Harrisburg Area, such as those in York and Lancaster Counties, do not consider themselves as, and are not, meaningful

competitors of Hershey, Pinnacle, or other hospitals in the Harrisburg Area for the provision of GAC services to residents of the Harrisburg Area because they draw very few patients from the Harrisburg Area.

30.    Health plans that offer health care networks in the Harrisburg Area do not consider hospitals outside of the Harrisburg Area to be viable substitutes for Harrisburg Area hospitals.  Very few of their members leave the Harrisburg Area to obtain GAC services, even for tertiary and quaternary care.

31.    Because residents of the Harrisburg Area strongly prefer to obtain GAC services in the Harrisburg Area, a health plan that did not have Harrisburg Area hospitals in its network would be very difficult to successfully market a network to employers and consumers in the area.  Accordingly, a health plan would not exclude from its network a hypothetical monopolist of hospital services in the Harrisburg Area in response to a small but significant price increase.

## MARKET STRUCTURE AND THE
## MERGER'S PRESUMPTIVE ILLEGALITY

32.    Hershey currently accounts for approximately 26% of the relevant market.  Pinnacle currently accounts for approximately 38% of the market.  A combined Hershey/Pinnacle would own by far the largest GAC hospital system within the Harrisburg Area.  Defendants' post-Merger market share would be overwhelming at approximately 64% of the relevant market.

33.   Of the three other hospitals that provide GAC services to residents in the Harrisburg Area, only one – Holy Spirit Hospital – is of any competitive significance.  Holy Spirit currently accounts for approximately 15% of the relevant market.  The remaining two hospitals are Carlisle Regional Medical Center (in central Cumberland County), which accounts for approximately 5% of the market, and WellSpan Good Samaritan Hospital (in central Lebanon County), which accounts for approximately 6% of the market.  These two hospitals are small community hospitals with limited service offerings and little appeal to residents of the Harrisburg Area.  They do not compete to any significant degree with the Defendants.  No other hospital accounts for more than 3% of the relevant market.  Accordingly, the proposed Merger would reduce the number of meaningful competitors in the Harrisburg Area from three to two.

34.   Under the relevant case law, including U.S. Supreme Court precedent and recent litigated hospital merger cases, the Merger is presumptively unlawful by a wide margin, as it would significantly increase concentration in an already highly concentrated market.

35.   The Herfindahl-Hirschman Index ("HHI") is used to measure market concentration under the Merger Guidelines.  A merger or acquisition is presumed likely to create or enhance market power under the Merger Guidelines, and thus, is

presumed illegal under relevant case law, when the post-merger HHI exceeds 2,500 points and the merger or acquisition increases the HHI by more than 200 points.

36.     Here, the market concentration levels far exceed those HHI thresholds.  The post-Merger HHI in the GAC services market will be over 4,400, an increase of approximately 2,000 points.  The approximate HHI figures and market shares for the GAC services market in the Harrisburg Area are summarized in the table below.

| GENERAL ACUTE CARE INPATIENT HOSPITAL SERVICES | | |
|---|---|---|
| Hospital System | Pre-Merger Market Share | Post-Merger Market Share |
| Penn State Hershey Medical Center | 26% | 64% |
| PinnacleHealth System | 38% | |
| Holy Spirit Health System – A Geisinger Affiliate (Cumberland County) | 15% | 15% |
| WellSpan Good Samaritan Hospital (Lebanon County) | 6% | 6% |
| Carlisle Regional Medical Center (Cumberland County) | 5% | 5% |
| Other (<3% share each) | 10% | 10% |
| HHI | 2,500 | 4,500 |
| Change in HHI | +2,000 | |

## ANTICOMPETITIVE EFFECTS

### A.

### Hospital Competition Yields Lower Prices and Higher Quality

37.    Competition between hospitals occurs in two distinct but related dimensions. First, hospitals compete to be selected as in-network providers for commercial health plans' members. Second, hospitals compete with each other on the basis of non-price features (*e.g.*, quality, amenities, etc.) to attract patients, including health plan members, to their facilities.

38.    In the first dimension of hospital competition, hospitals compete to be included in health plan networks. To become an in-network provider, a hospital negotiates with a health plan and, if mutually agreeable terms can be reached, enters into a contract. Reimbursement rates (*i.e.,* prices), which the hospital charges to a health plan for services rendered to a health plan's members, are the primary contractual terms negotiated.

39.    In-network status benefits the hospital by giving it preferential access to the health plan's members. Health plan members typically pay far less to access in-network hospitals than out-of-network hospitals. Thus, all else being equal, an in-network hospital will attract more patients from a particular health plan than an out-of-network hospital. This dynamic motivates hospitals to offer lower rates to

health plans to win inclusion in their networks.

40.    From the health plan's perspective, having hospitals in-network is beneficial because it enables the health plan to create a healthcare provider network in a particular geographic area that is attractive to current and prospective members, typically local employers and their employees.

41.    A critical determinant of the relative bargaining positions of a hospital and a health plan during negotiations is whether other, nearby comparable hospitals are available to the health plan and its members as alternatives in the event of a negotiating impasse.  The presence of alternative hospitals limits a hospital's bargaining leverage and thus constrains its ability to obtain higher reimbursement rates from health plans.  The more attractive these alternative hospitals are to a health plan's members in a local area, the greater the constraint on that hospital's bargaining leverage.  Where there are few or no meaningful alternatives, a hospital will have greater bargaining leverage to demand and obtain higher reimbursement rates.

42.    A merger between hospitals that are close substitutes from the perspective of health plans and their members therefore tends to produce increased bargaining leverage for the merged entity and, as a result, higher negotiated rates, because it eliminates a competitive alternative for health plans.

43.     Increases in the reimbursement rates negotiated between a hospital and a health plan significantly impact the health plan's members. "Self-insured" employers rely on a health plan for access to its provider network and negotiated rates. These employers pay the cost of their employees' health care claims directly and thus bear the full and immediate burden of any rate increases in the healthcare services used by their employees. "Fully-insured" employers pay premiums to health plans—and employees pay premiums, co-pays, co-insurance and/or deductibles—in exchange for the health plan assuming financial responsibility for paying hospital costs generated by the employees' use of hospital services. When hospital rates increase, health plans pass on these increases to their fully-insured customers in the form of higher premiums, co-pays, co-insurance and/or deductibles.

44.     In the second dimension of hospital competition, hospitals compete to attract patients to their facilities by offering higher quality care, amenities, convenience, and patient satisfaction than their competitors. This competition can be significant because health plan members often have a choice of in-network hospitals where they face similar out-of-pocket costs. Hospitals also compete on these non-price dimensions to attract patients covered by Medicare and Medicaid, as well as other patients without commercial insurance. A merger of competing

hospitals eliminates that non-price competition and reduces their incentive to improve and maintain quality.

## B.

### The Merger Would Eliminate
### Close Competition between Hershey and Pinnacle

45.     Hershey and Pinnacle are vigorous competitors in the relevant market due to the similarity in services that they both offer and their geographic proximity. The Merger would eliminate direct and substantial competition between the Defendants and create a dominant health system that could increase reimbursement rates and/or reduce service levels for GAC inpatient services. Close competition in the relevant market is evident from a wide variety of evidence, including econometric analysis of the Defendants' patient draw data, ordinary-course documents, testimony, and information from health plans.

46.     A standard economic analysis of the closeness of competition known as diversion analysis, which is based on data about where patients receive hospital services, confirms that Hershey and Pinnacle are very close competitors. More specifically, Pinnacle is the only significant competitor of Hershey and Hershey is the only significant competitor of Pinnacle other than Holy Spirit Hospital. Diversion analyses show that if Hershey were no longer available, over 40% of its patients would seek GAC services at Pinnacle. Similarly, if Pinnacle were no

18

longer available to patients, over 30% of its patients would seek GAC services at
Hershey. The diversions between the Defendants are higher than those present in
recent hospital merger cases where courts have found that the transaction at issue
would substantially lessen competition and, therefore, violated the Clayton Act.

47.   Hershey and Pinnacle offer a wide range of overlapping GAC
inpatient service lines, from primary to higher-end tertiary and quaternary care,
with the limited exceptions of major organ transplants and high-end trauma care,
which are provided by Hershey but not by Pinnacle. Data show that the services
offered by each of the Defendants substantially overlap with one another.
Diagnosis-related groups ("DRGs") are categories of diagnoses used by Medicare
and health plans to set reimbursement rates. 98% of Hershey's patients are in
DRGs that are offered by Pinnacle. Similarly, 97% of Pinnacle's patients are in
DRGs offered by Hershey.

48.   According to the Defendants' documents, Pinnacle and Hershey
"aggressively compete with one another in many areas" and view each other as
close competitors. For example, in 2011, Hershey hired a consulting firm to
conduct a detailed service line analysis, which concluded that Pinnacle was
Hershey's most significant, and often the "dominant," local competitor in
numerous key services lines, including neurosciences, heart and vascular,

19

orthopaedics, obstetrics and gynecology ("OB/GYN"), spine, and pediatrics. The analysis also states that within the local market, Hershey had increased its market share in orthopedic services by "taking away market share from Pinnacle." The same analysis also notes that Hershey is the "dominant player" in pediatrics while Pinnacle is the "second dominant player." Similarly, Pinnacle views Hershey as its "main competitor" for OB/GYN services. A Pinnacle analysis lists the top inpatient services lines, for both Pinnacle and Hershey, as "OB/birthing services, general medicine, ortho/spine, and general surgery."

49.    In addition, Pinnacle has been expanding its service offerings and is currently implementing its strategic Vision 2017 Plan, which includes renovating Pinnacle's Harrisburg Hospital to establish it as a "tertiary referral center" that would further enhance its competition with Hershey.

50.    Pinnacle's ordinary course documents and business plans identify Hershey and Holy Spirit Hospital as its two principal competitors and frequently focus on Hershey as its main competitor. Pinnacle routinely generates reports tracking "leakage" of referrals from primary care physicians to Hershey, and it routinely tracks Hershey's market shares by service line. While Holy Spirit competes in the Harrisburg Area, Pinnacle's documents reveal that "[d]espite its efforts to become indispensable to the entire Harrisburg market, Holy Spirit

20

remains a medium-sized community hospital with a limited (West Shore) service area and few distinctions." Its service lines are "modest when compared to Pinnacle's."

51.    Similarly, Hershey's internal documents reveal that Hershey identifies Pinnacle as being one of its principal competitors. Hershey focuses significant attention on Pinnacle's strategy, while focusing its own competitive strategies on capturing market share from Pinnacle.

52.    The Defendants are also close competitors because of their geographic proximity. Competition between Hershey and Pinnacle is particularly intense in Dauphin County, where Hershey and Pinnacle operate the only GAC hospitals and the only emergency departments (where the Defendants draw approximately half of their inpatient admissions), and both draw more patients from Dauphin County than any other county. Post-Merger, the Defendants will operate the only two emergency rooms in Dauphin County and two of only three emergency rooms within 25 miles of downtown Harrisburg.

53.    Competition between Hershey and Pinnacle also extends into Cumberland and Lebanon Counties. Hershey has expanded its primary care services in Cumberland County to drive referrals to Hershey Medical Center following Pinnacle's opening of West Shore Hospital in Cumberland County in

2014. Pinnacle has expanded its primary care services in Lebanon County, near Hershey Medical Center, in order to compete with Hershey and drive referrals to Pinnacle hospitals. Both Pinnacle and Hershey have both expanded their oncology services in Cumberland County.

54.     Health plans that serve the Harrisburg Area confirm that Hershey and Pinnacle are large health systems that compete closely against one another by offering very similar services and high levels of quality. Because Holy Spirit's services are more limited, health plans consider it to be in a lower tier than Hershey and Pinnacle. Health plans do not view other hospitals in the Harrisburg Area—Carlisle Regional Medical Center or Good Samaritan Hospitals—as viable substitutes for the Defendants for Harrisburg Area residents due to their more limited service offerings and distance.

## C.

### The Merger Would Eliminate Price Competition and Increase the Merged Entity's Bargaining Leverage

55.     Because the Merger would eliminate direct competition between Pinnacle and Hershey, a combined Hershey/Pinnacle would have increased bargaining leverage, allowing it to raise rates for GAC inpatient services in the Harrisburg Area. This increased leverage could manifest itself in multiple ways

including through an increase in rates across the entire combined hospital system or by raising Pinnacle's rates to Hershey's rate levels, which are higher. Such leverage could negatively affect agreements with traditional fee-for-service arrangements and/or new reimbursement models such as risk sharing, by, for example, allocating more risk to the health plan and less risk to a combined Hershey/Pinnacle.

56.    Currently, health plans in the Harrisburg Area can negotiate lower rates by threatening to exclude Hershey or Pinnacle from their networks because the other hospital serves as a close alternative for patients living in the Harrisburg Area. For example, a large health plan that serves the Harrisburg Area recently resisted rate increases proposed by Pinnacle by threatening to exclude Pinnacle from its network and create a hospital network limited to Hershey and Holy Spirit. This threat resulted in Pinnacle accepting a more modest rate increase than it had demanded.

57.    If Hershey and Pinnacle were to merge, health plans could no longer threaten to exclude the combined Hershey/Pinnacle from their networks or otherwise use competition between Hershey and Pinnacle to negotiate better reimbursement rates. In fact, one of Pinnacle's stated "transaction objectives" was to "establish a health care provider that is a 'must have' for payers."

23

58.     Moreover, health plans have confirmed that a provider network that lacked the combined Hershey/Pinnacle would be very difficult, if not impossible, to market to Harrisburg Area residents.  This is evidenced by the recent experience of one area health plan.  For over a decade, this health plan was able to market a viable network in the Harrisburg Area that included Pinnacle and Holy Spirit, but did not include Hershey.  However, in 2015, after Pinnacle terminated its provider agreement with the health plan, the health plan rapidly lost almost half of its members in the Harrisburg Area and is now unable to market a viable network in the area.

59.     Numerous health plans have expressed concern that the proposed Merger will eliminate competition and result in price increases.  For example, a representative of Capital BlueCross, the second large health plan in the Harrisburg Area, sent an email to the Defendants which stated that "[w]ith the proposed merger, the new entity would control greater than 50% of the market and without a strategic long-term partnership defined for Capital, we would have concerns that the new entity would ultimately have too much leverage and Capital would not be able to negotiate market appropriate pricing and terms."  Indeed, the CEO of Hershey acknowledged that health plans had "a lot of anxiety" that the Defendants would use the Merger as a means to raise prices.

24

60.    As confirmed by numerous area health plans, the Harrisburg Area currently benefits from competition between Hershey and Pinnacle and has lower reimbursement rates than those that prevail in more concentrated markets in Pennsylvania, most notably York and Lancaster Counties, where a single health system dominates each market.

61.    Post-Merger, the transaction would eliminate this beneficial competition and create a dominant health system in the Harrisburg Area. Accordingly, if allowed to proceed, the Merger would substantially increase the combined entity's bargaining leverage in negotiations and result in higher rates.

### D.

### The Merger Eliminates Vital Quality Competition

62.    In addition to price competition, Hershey and Pinnacle compete extensively on non-price dimensions, including expansion of services, quality of care, and the use of state-of-the-art facilities and technology.  Patients in the Harrisburg Area have benefitted from this competition.

63.    In order to further compete with Hershey, Pinnacle has expanded its tertiary services in recent years.  For example, Pinnacle has expanded and modernized its facilities, and introduced new advanced service lines pursuant to its Vision 2017 Plan, all to the benefit of Harrisburg Area residents.  Pinnacle recently

renovated Harrisburg Hospital and its other hospitals to modernize, increase the number of private rooms, and add clinical space. Pinnacle has also expanded its service line offerings and implemented numerous operational improvements and best practices to improve its quality metrics and patient satisfaction. These improvements were driven by Pinnacle's desire to improve the patient experience and attract additional patients to Pinnacle and away from Hershey.

64.    Competition between Pinnacle and Hershey is particularly evident in their efforts to improve and expand their respective oncology services. Pinnacle's strategic plan for its new state-of-the-art Ortenzio Cancer Center in Cumberland County states that "[t]he one competitor that brings the biggest challenge to us is the University Hospital for the medical school at Penn State Milton S. Hershey Medical Center … In order for Pinnacle to be competitive we will have to assure that the patient experience is superior." An internal Hershey document about Pinnacle's Cancer Center notes "the future of the West Shore cancer market is at risk" and that Pinnacle is "making aggressive moves to grow its market share."

65.    Pinnacle also has improved the quality of care at its hospitals to attract more patients from the Harrisburg Area. Pinnacle's internal documents show that it implemented operational improvements and best practices in order to improve its quality metrics and patient satisfaction.

66.     Hershey has begun to implement strategic plans to expand its network of primary care practices and to construct a new outpatient ambulatory facility to increase access for patients in the Harrisburg Area and to compete with Pinnacle. It expanded outpatient services in Cumberland County to drive referrals to Hershey Medical Center and "steal market share from Pinnacle."

67.     Hershey's documents also show its recognition that it needs to reduce costs and improve its quality and efficiency to remain competitive with Pinnacle and other competitors.  It is "working to improve operational and cost performance" with specific initiatives on "quality & safety" and "cost efficiency."

68.     The Merger would eliminate this beneficial competition between Hershey and Pinnacle on these vital non-price factors, thereby reducing incentives to improve quality, implement new medical technologies, and expand services in the Harrisburg Area.  In addition, the Defendants intend, post-Merger, to move low acuity cases from Hershey to Pinnacle and high acuity cases from Pinnacle to Hershey.  Such plans will further reduce the combined Hershey/Pinnacle's incentive to continue to invest in tertiary services at Pinnacle, and reduce costs and improve efficiency at Hershey.  Losing these important benefits would affect all patients in the Harrisburg Area.

## E.

### Defendants' Recent Rate Agreements With
### Two Health Plans Would Not Prevent Competitive Harm

69.    The Defendants have recently entered into multi-year agreements with the two largest health plans in the Harrisburg Area. These rate agreements – one is a term sheet, the other is letter agreement – purport to extend the Defendants' existing rate agreements with the health plans and commit to maintain the rate differential between Pinnacle and Hershey. The rate agreements were designed to forestall opposition to the Merger. One of these health plans requested the agreement "to ensure that [its] members are protected for a significantly long period of time from any adverse economic impact of the Pinnacle-Hershey merger." Accordingly, these rate agreements are strong evidence that the payors believe that the Merger would result in anticompetitive increases in reimbursement rates to health plans imposed by the combined Hershey/Pinnacle. However, these rate agreements do not alleviate the anticompetitive effects of the Merger.

70.    First, the rate agreements are limited to only two health plans. The Defendants have not entered into similar agreements with other health plans in the Harrisburg Area. Accordingly, the combined Hershey/Pinnacle would be able to use its enhanced bargaining leverage to demand higher prices or better terms,

28

without any constraints, when negotiating with these other health plans.

71.     Second, the rate agreements foreclose the possibility that, absent the Merger, competition could lead to rates that increase less quickly or even decrease. Similarly, they do not address that the change in bargaining dynamics due to the merged entity's increased leverage would also apply to different types of agreements, such as risk-sharing arrangements, which are purportedly contemplated by the letter agreements in the future.   Under such newer reimbursement arrangements, the health plan and the provider must negotiate over the level of risk that each party bears.  Here, the combined entity could use its increased bargaining leverage post-Merger to the detriment of health plans (and ultimately their members) when negotiating risk-sharing or value-based agreements.

72.     Third, the rate agreements do nothing to preserve the service and quality competition between Pinnacle and Hershey that has benefitted Harrisburg Area residents and patients and that the Merger would eliminate.

73.     Finally, the rate agreements are of limited duration.  When they terminate, the Defendants will no longer be subject to any purported commitment to maintain the rate differential.  Accordingly, the combined Hershey/Pinnacle would be able to use its enhanced bargaining leverage to demand higher prices or

better terms from the two health plans, without any constraints, when negotiating

both traditional fee-for-service contracts as well as contracts with newer

reimbursement models.

## ENTRY BARRIERS

74. Neither entry by new healthcare providers into the relevant service

market nor expansion by existing market participants will deter or counteract the

Merger's likely serious competitive harm in the relevant service market.

75. New hospital entry in the Harrisburg Area would not be likely, timely,

or sufficient to offset the Merger's harmful effects. Construction and operation of

a new GAC inpatient hospital involves high costs and serious financial risk. The

construction of a new hospital also would take much more than two years from the

initial planning stage to opening, as evidenced by the significant time and expense

involved in the building of Pinnacle's West Shore Hospital and Hershey's

Children's Hospital.

76. Even if new hospital entry did occur, it likely would not be sufficient

to offset the Merger's harm because a new hospital could not achieve the scale

required to offer the broad cluster of GAC services comparable to those offered by

the Defendants. Hershey and Pinnacle are both large, high-quality health systems,

which offer a full range of GAC services and employ a significant number of

physicians. Their service capabilities, strong reputations, and significant share of the relevant market present significant barriers to entry and would be extremely challenging for a new entrant to replicate in a manner sufficient to counteract the likely anticompetitive effects of the Merger.

77.     Moreover, hospitals both outside and within the Harrisburg Area have affirmed that they have no plans to enter or build new hospitals in the Harrisburg Area. In fact, the Defendants are the only healthcare providers that have constructed new hospitals in the relevant area (one each) in over a decade.

## EFFICIENCIES

78.     No court ever has found, without being reversed, that efficiencies rescue an otherwise illegal transaction. Here, in order to rebut the presumption that the Merger is unlawful, Defendants would need to present evidence that extraordinary merger-specific efficiencies, which will be passed on to consumers, outweigh the Merger's likely significant harm to competition in the Harrisburg Area. However, Defendants' efficiency claims are overstated, speculative, unverifiable, not merger-specific, or result from an anticompetitive reduction in output, quality, or services, and are largely non-cognizable. Overall, Defendants' efficiency claims, to the extent they are cognizable, are insufficient to offset the substantial competitive harm the Merger is likely to cause.

79.    Defendants have claimed that Hershey is at capacity and the Merger will allow the Defendants to transfer patients suffering from less severe illnesses from Hershey to Pinnacle, which has the capacity to treat them.  Defendants further claim that this will allow Hershey to avoid constructing a new inpatient bed tower to alleviate its capacity issues.

80.    However, Hershey could alleviate its capacity constraints in a timely manner without the Merger.  Moreover, the Defendants' alleged efficiency plans would result in competitive harm.  Defendants' plans would force patients to go to a different hospital than the one they originally chose.  Defendants' plans would also reduce output, capacity, and service compared to the but-for world without the Merger, thereby denying patients the benefits of new inpatient rooms at Hershey.  Accordingly, these claims are not cognizable under the law.

81.    The Defendants have also claimed that the Merger may achieve other operational efficiencies.  However, these efficiency claims are speculative, overstated, and have not been substantiated by the Defendants.

### LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF EQUITIES, AND NEED FOR RELIEF

82.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed merger is unlawful, to seek preliminary injunctive relief to prevent consummation of a merger until the

Commission has had an opportunity to adjudicate the merger's legality in an administrative proceeding.  The Court may grant preliminary injunctive relief upon a proper showing that weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest.  The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in effective enforcement of the antitrust laws.  Private equities affecting only Defendants' interest cannot defeat a preliminary injunction.

83.    The Commission is likely to succeed in proving that the effect of the Merger may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, or Section 5 of the FTC Act, 15 U.S.C § 45.

84.    Preliminary relief is warranted and necessary. Should the Commission rule, after the full administrative trial, that the Merger is unlawful, reestablishing the *status quo ante* of vigorous competition between Hershey and Pinnacle would be difficult, if not impossible, if the Merger has already occurred in the absence of preliminary relief.  Moreover, in the absence of relief from this Court, substantial harm to competition would likely occur in the interim, even if suitable remedies were obtained later.

85.    Accordingly, the equitable relief requested here is in the public

interest.  WHEREFORE, the Commission and the Commonwealth of Pennsylvania respectfully request that the Court:

1.     Temporarily restrain and preliminarily enjoin Defendants from taking any further steps to consummate the Merger, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

2.     Retain jurisdiction and maintain the *status quo* until the administrative proceeding that the Commission has initiated is concluded;

3.     That Plaintiffs be awarded their costs of this action, including attorneys' fees to the Commonwealth of Pennsylvania; and

4.     Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated: December 9, 2015                    Respectfully submitted,

                                           _____
                                           WILLIAM H. EFRON
                                           Director
                                           Northeast Region
                                           Federal Trade Commission

                                           JARED P. NAGLEY
                                           GERALYN J. TRUJILLO
                                           RYAN F. HARSCH
                                           JONATHAN W. PLATT
                                           NANCY TURNBLACER
                                           THEODORE ZANG
                                           GERALD A. STEIN
                                           Attorneys
                                           Bureau of Competition
                                           Federal Trade Commission
                                           Northeast Region
                                           One Bowling Green, Suite 318
                                           New York, NY 10004
                                           Telephone: (212) 607-2829
                                           Email: wefron@ftc.gov
                                                  jnagley@ftc.gov

                                           DEBORAH L. FEINSTEIN
                                           Director
                                           Bureau of Competition
                                           Federal Trade Commission

                                           JONATHAN NUECHTERLEIN
                                           General Counsel
                                           Federal Trade Commission

                                           *Attorneys for Plaintiff*
                                           *Federal Trade Commission*

35

Dated:    December 9, 2015          Respectfully submitted,

Bruce Beemer
First Deputy Attorney General
James A. Donahue, III
Executive Deputy Attorney General
Public Protection Division
PA 42624

By:

Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section
14th Floor Strawberry Square
Harrisburg, PA 17120
(717) 787-4530 (phone)
(717) 705-1190 (fax)
twertz@attorneygeneral.gov
PA 69164

Jennifer A. Thomson
Senior Deputy Attorney General
Antitrust Section
jthomson@attorneygeneral.gov
PA 89360

Aaron L. Schwartz
Deputy Attorney General
Antitrust Section
aschwartz@attorneygeneral.gov
PA 319615

*Attorneys for the Commonwealth
of Pennsylvania*

36