## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION<br><br>and<br><br>COMMONWEALTH OF<br>PENNSYLVANIA,<br><br>    Plaintiffs,<br><br>  vs.<br><br>PENN STATE HERSHEY<br>MEDICAL CENTER<br><br>and<br><br>PINNACLEHEALTH SYSTEM,<br><br>   Defendants. | Civil Action No.: 1:15-cv-2362<br><br>Hon. John E. Jones III |

## <u>MEMORANDUM OPINION AND ORDER</u>

### May 9, 2016

Before the Court is a motion by Plaintiffs, Federal Trade Commission

("FTC") and the Commonwealth of Pennsylvania, pursuant to Section 13(b) of the

FTC Act, 15 U.S.C. § 53(b), for a preliminary injunction enjoining Defendants,

Penn State  Hershey Medical Center ("Hershey") and PinnacleHealth System

("Pinnacle") (collectively, "the Hospitals"), from taking any steps towards

consummating their proposed merger pending the completion of the FTC's administrative trial on the merits of the underlying antitrust claims. For the reasons that follow, the Motion for Preliminary Injunction shall be denied.

## I.   BACKGROUND[1]

Penn State Hershey Medical Center is a 551-bed hospital located in Hershey, Pennsylvania. It is a leading academic medical center ("AMC") and the primary teaching hospital of the Penn State College of Medicine. (DX1160-009). Hershey offers a broad array of high-acuity services, and tertiary and quaternary care, including bone-marrow transplants, neurosurgery, and specialized oncologic surgery.[2] Hershey operates central Pennsylvania's only specialty children's hospital, one of the Commonwealth's three Level I trauma centers, and the only heart-transplant center outside Philadelphia and Pittsburgh. (DX0190-005; DX0527-010; DX1160-009; DX0803-002).

PinnacleHealth System is a not-for-profit health system with 646 licensed beds across three campuses: Harrisburg Hospital and Community General Osteopathic Hospital, both in Harrisburg, and West Shore Hospital in Cumberland

---

[1] Citations to the record are identified in the following ways: (1) documents already on file with the Court are cited as "Doc." followed by the docket number and any further pinpoint citation; (2) references to testimony from the evidentiary hearing are cited as "Tr." followed by the specific page numbers; and (3) exhibits are cited to by reference to their marked number, and where applicable, further pinpoint citation to the specific page, paragraph, or section.

[2] Tertiary care is sophisticated, complex, or high-tech care that includes, for example, open heart surgery, oncology surgery, neurosurgery, high-risk obstetrics, neonatal intensive care and trauma services. Quaternary care is even more sophisticated and includes organ transplants.

County, Pennsylvania.  (DX0196-001-002).  All three of Pinnacle's hospitals are community hospitals focused on cost-effective acute care, although Pinnacle offers some higher-level services including open-heart surgery, kidney transplants, chemotherapy and radiation oncology.  (Tr., pp. 523:15-525:22).

The Hospitals signed a Letter of Intent of their proposed merger in June of 2014, and received final board approval in March of 2015.  (PX00643).  In April of 2015, the Hospitals notified the FTC of their proposed merger and executed a "Strategic Affiliation Agreement" one month later.  (PX00390-011; PX01338).

Following an investigation, on December 7, 2015, the FTC issued an administrative complaint alleging that the Hospitals' proposed merger violates Section 7 of the Clayton Act and Section 5 of the FTC Act.  A merits trial in the FTC administrative proceeding is scheduled to commence on May 17, 2016.  On December 9, 2015, Plaintiffs filed their Complaint in this action.  (Doc. 4).  The Hospitals filed their Answer on January 11, 2016.  (Doc. 41).  The instant Motion for Preliminary Injunction was filed on March 7, 2016 and was subsequently briefed by the parties.  (Docs. 82, 96, and 102).

Following a period of expedited discovery, the Court conducted a five-day evidentiary hearing commencing on April 11, 2016.  The Court heard testimony from 16 witnesses, including two economists, and admitted thousands of pages of

exhibits into evidence.  Following the hearing, both sides filed post-hearing briefs.

(Docs. 129 and 130).  This matter is thus fully ripe for our review.

## II.   ANALYSIS

### A.   Standard of Review for Preliminary Injunctive Relief

When the FTC has reason to believe that "any person, partnership, or

corporation is violating, or is about to violate, any provision of law enforced by the

Federal Trade Commission," including Section 7 of the Clayton Act, it is

authorized by § 13(b) of the FTC Act to "bring suit in a district court of the United

States to enjoin any such act or practice."  15 U.S.C. § 53(b).  The district court

may grant a request for preliminary injunctive relief "[u]pon a proper showing that,

weighing the equities and considering the Commission's likelihood of ultimate

success, such action would be in the public interest."  *Id*.  Therefore, "in

determining whether to grant a preliminary injunction under section 13(b), a

district court must (1) determine the likelihood that the FTC will ultimately

succeed on the merits and (2) balance the equities." *FTC v. United Health, Inc.*,

938 F.2d 1206, 1217 (11th Cir. 1991); *see also FTC v. Click4Support*, 2015 U.S.

Dist. LEXIS 153945, *12-13 (E.D.Pa. Nov. 10, 2015) (noting that while the Third

Circuit has not expressly adopted this standard, several other circuits have done so,

as well as the District of New Jersey); *FTC v. Millennium Telecard, Inc.*, 2011

U.S. Dist. LEXIS 74951, *6-7 (D.N.J. Jul. 12, 2011).

### B.      Section 7 of the Clayton Act

Section 7 of the Clayton Act prohibits mergers whose effect "may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.  Section 7 is "designed to arrest in its incipiency . . . the substantial lessening of competition from the acquisition by one corporation" of the assets of a competing corporation.  *United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 589 (1957).  To be sure, "Congress used the words 'may be substantially to lessen competition' to indicate that its concern was with probabilities, not certainties." *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962).  "Ephemeral possibilities" of anticompetitive effects are not sufficient to establish a violation of Section 7, *United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 623 (1974) (quotation marks omitted), nor will "a fair or tenable chance of success on the merits . . . suffice for injunctive relief."  *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045 (8th Cir. 1999) (citation omitted).

The first step in a Clayton Act analysis is "[t]he determination of the relevant market."  *E.I. du Pont,* 353 U.S. at 593.  "A relevant market consists of two separate components: a product market and a geographic market."  *Id.* (citing *Morgenstern v. Wilson*, 29 F.3d 1291, 1296) (8th Cir. 1994).  "Without a well-defined relevant market, an examination of a transaction's competitive effects is without context or meaning."  *FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir.

1995).  Thus, "[i]t is . . . essential that the FTC identify a credible relevant market before a preliminary injunction may properly issue," because a merger's effect cannot be properly evaluated without a well-defined relevant market.  *Tenet Health*, 186 F.3d at 1051.  Courts have observed that "[a] monopolization claim often succeeds or fails strictly on the definition of the product or geographic market."  *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1075 (N.D. Ill. 2012) (quoting *Tenet Health*, 186 F. 3d at 1052); *see also Morgenstern,*29 F. 3d at 1296.  The FTC bears the burden of defining a valid market.  *See FTC v. Lundbeck, Inc.*, 650 F. 3d 1236, 1239-40 (8th Cir. 2011).

A relevant product market is a "line of commerce" affected by a proposed merger, *see Brown Shoe Co.*, 370 U.S. at 324, and is defined by determining "whether two products can be used for the same purpose, and if so, whether and to what extent purchasers are willing to substitute one for the other."  *U.S. v. H&R Block,*, 883 F. Supp. 2d 36, 51 (D.D.C. 2011) (citations and quotations omitted).  In the matter *sub judice,* the parties agree that the relevant product market is general acuity services ("GAC") sold to commercial payors.  GAC services comprise a broad cluster of medical and surgical services that require an overnight hospital stay.  (Doc. 82, pp. 7-8; Doc. 96, p. 7).

"The relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks."  *Hanover 3201 Realty,*

*LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 183-84 (3d Cir. 2015) (quoting

*Eichorn v. AT&T Corp.*, 248 F.3d 131, 147 (3d Cir. 2001) (citing *Pa. Dental Ass'n*

*v. Med. Serv. Ass'n of Pa.*, 745 F.2d 248, 260 (3d Cir. 1984)).   Determination of

the relevant geographic market is highly fact sensitive.  *Tenet Health,* 186 F. 3d at

1052 (citing *Freeman Hosp.*, 69 F.3d at 271, n. 16). "This geographic market must

'conform to commercial reality,'" *Eichorn*, 248 F.3d at 147 (quoting *Acme Mkts.,*

*Inc. v. Wharton Hardware & Supply Corp.,* 890 F. Supp. 1230, 1239 (D.N.J.

1995)(citing *Brown Shoe Co.*, 370 U.S. at 336)), and can be determined "only after

a factual inquiry into the commercial realities faced by consumers." *Tenet Health*,

186 F.3d at 1052 (citing *Flegel v. Christian Hosp. Northeast-Northwest*, 4 F.3d

682, 690 (8th Cir. 1993).   Further, the Department of Justice and Federal Trade

Commission's *Horizontal Merger Guidelines* "provides guidance" in defining a

geographic market.  *Atl. Exposition Servs. Inc. v. SMG,* 262 F. App'x 449, 452 (3d

Cir. 2008)  The most recent version of the *Merger Guidelines* defines a relevant

geographic market as the smallest area in which a hypothetical monopolist could

profitably raise prices by a "small but significant amount" for a meaningful period

of time (referred to as a "SSNIP").  *See* U.S. Dep't of Justice and Fed. Trade

Comm'n, *Horizontal Merger Guidelines*, §§ 4.1, 4.2 (2010).

### C.     Relevant Geographic Market

The FTC contends that the relevant geographic market for purposes of our analysis is the "Harrisburg Area," which is "roughly equivalent to the Harrisburg Metropolitan Statistical Area (Dauphin, Cumberland and Perry Counties) and Lebanon County."  (Doc. 82, pp. 8-9).  The FTC contends that geographic markets for GAC services are inherently local because people want to be hospitalized near their families and homes.  To support this contention, the FTC posits that patients who live in the Harrisburg Area overwhelmingly utilize hospitals close to home, primarily Hershey and Pinnacle, and very few patients travel to hospitals outside of the Harrisburg Area.  The FTC further contends that the two main commercial health insurance payors in the Harrisburg Area, Capital Blue Cross ("CBC") and Highmark recognize the Harrisburg Area as a distinct market and would not exclude the proposed merged entity from their networks. The Hospitals heartily disagree, arguing that the FTC's four county relevant geographic market is far too narrowly drawn and is untethered to the commercial realities facing patients and payors.  It is the resolution of this threshold dispute that is dispositive to the outcome of the instant Motion.

"Properly defined, a geographic market is a geographic area 'in which the seller operates, and to which . . . purchaser[s] can practicably turn for supplies.'" *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591 (8th Cir. 2009)

(quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)); *see also Morgenstern*, 29 F.3d at 1291. "Broken down, the test requires a court to first determine whether a plaintiff has alleged a geographic market that includes the area in which a defendant supplier draws a sufficiently large percentage of its business – 'the market area in which the seller operates,' its trade area." *Id.* (citing *Morgenstern*, 29 F.3d at 1296). "A court must then determine whether a plaintiff has alleged a geographic market in which only a small percentage of purchasers have alternative suppliers to whom they could practicably turn in the event that a defendant supplier's anticompetitive actions result in a price increase." *Id.* "The end goal in this analysis is to delineate a geographic area where, in the medical setting, "'few' patients leave. . . and 'few' patients enter." *Id.* (quoting *U.S. v. Rockford Mem'l Corp.*, 717 F. Supp. 1251, 1267 (N.D. Ill. 1989), aff'd 898 F.2d 1278 (7th Cir. 1990)).

Of particular import to our analysis is the uncontroverted fact that, in 2014, 43.5% of Hershey's patients, 11,260 people, travel to Hershey from outside of the FTC's designated Harrisburg Area, and several thousand of Pinnacle's patients reside outside of the Harrisburg Area. (DX1698-0048). Further, half of Hershey's patients travel at least thirty minutes for care, and 20% travel over an hour to reach Hershey, resulting in over half of Hershey's revenue originating outside of the Harrisburg area. (DX 1698-0034-36; DX1698-0049). These salient facts

controvert the FTC's assertion that GAC services are "inherently local," and strongly indicate that the FTC has created a geographic market that is too narrow because it does not appropriately account for where the Hospitals, particularly Hershey, draw their business.

Next, the FTC presents a starkly narrow view of the amount of hospitals patients could turn to if the combined Hospitals raised prices or let quality suffer. There are 19 hospitals within a 65 minute drive of Harrisburg, and many of these hospitals are closer to patients who now come to Hershey. Thus, if a hypothetical monopolist such as the combined Hospitals imposed a SSNIP, these other hospitals would readily offer consumers an alternative. Further, given the realities of living in Central Pennsylvania, which is largely rural and requires driving distances for specific goods or services, it is our view that these 19 other hospitals within a 65 minute drive of Harrisburg provide a realistic alternative that patients would utilize. Thus, the relevant geographic market proffered by the FTC is not one in which "'few' patients leave. . . and 'few' patients enter." *Little Rock Cardiology*, 591 F. 3d at 591.

Finally, during the evidentiary hearing, the Court heard hours of economic expert testimony regarding the hypothetical monopolist's ability to impose a SSNIP in the context of this proposed merger. The Court finds it extremely compelling that the Hospitals have already taken steps to ensure that post-merger

rates do not increase with CBC and Highmark, central Pennsylvania's two largest payors, representing 75-80% of the Hospitals' commercial patients. (DX 1166-01; DX 1167-003; DX 1698-0120-0124). To wit, the Hospitals have executed a 5-year contract with Highmark and a 10-year contract with CBC that not only require the Hospitals to contract with these payors for those periods, but to maintain existing rate structures for fee-for-service contracts and preserve the existing rate-differential between the Hospitals. The result of these agreements is that the Hospitals cannot walk away from these payors and that rates <u>cannot increase</u> for at least 5 years. (DX 0095 ¶ 14). The Court simply cannot be blind to this reality when considering the import of the hypothetical monopolist test advanced by the *Merger Guidelines*. Thus, the FTC is essentially asking the Court prevent this merger based on a prediction of what might happen to negotiating position and rates in 5 years. In the rapidly-changing arena of healthcare and health insurance, to make such a prediction would be imprudent, and as such, we do not find that the outcome of the hypothetical monopolist test aids the FTC in this matter.

In sum, we find based on the hours of testimony and thousands of pages of exhibits presented by the parties and considered by this Court, that the FTC's four county "Harrisburg Area" relevant geographic market is unrealistically narrow and does not assume the commercial realities faced by consumers in the region. Because the Government has failed to set forth a relevant geographic market, it

cannot establish a *prima facie* case under the Clayton Act.  Therefore, the FTC's

request for injunctive relief must be denied because it has not demonstrated a

likelihood of ultimate success on the merits.  *See Tenet Health*, 186 F.3d at 1053-

55 (denying a preliminary injunction on the grounds of failure to provide sufficient

evidence of a relevant geographic market); *Freeman Hosp.*, 69 F.3d at 268-72

(same); *California v. Sutter Health Sys.*, 130 F. Supp.2d 1109, 1132 (N.D. Cal.

2001) (same).

**D**.    **Equities**

The FTC's impermissibly narrow interpretation of the relevant geographic

market has caused this Court to determine that the FTC has not established a

likelihood of success on the merits.  Had the FTC demonstrated a likelihood of

ultimate success, however, the burden of proof would have shifted to the Hospitals

to "clearly" show that their combination would not cause anticompetitive effects.

*U.S. v. Citizens & S. Nat. Bank*, 422 U.S. 86, 120 (1975) (explaining that once the

Government plainly made out a *prima facie* case establishing a violation of Section

7, it "was incumbent upon [the defendants] to show that the market-share statistics

gave an inaccurate account of the acquisitions' probable effects on competition.").

As a precaution, then, the Hospitals presented ample evidence demonstrating that

anticompetitive effects would not arise through the merger of Hershey and

Pinnacle.  This evidence warrants consideration in our weighing of the equities here.

As noted in the Standard of Review, *see* Section II.A, along with consideration of the FTC's likelihood of success, a weighing of the equities present in this case is required to determine whether enjoining the merger would be in the best interests of the public.  *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001) ("Section 13(b) provides for the grant of a preliminary injunction where such action would be in the public interest—as determined by a weighing of the equities and a consideration of the Commission's likelihood of success on the merits.").  "Absent a likelihood of success on the merits, however, equities alone will not justify an injunction."  *F.T.C. v. Arch Coal, Inc*., 329 F.Supp.2d 109, 159 (D.D.C. 2004) (citing *F.T.C. v. PPG Indus., Inc*., 798 F.2d 1500, 1508 (D.C. Cir. 1986)).  The Seventh Circuit has adopted a "sliding scale" approach to a consideration of the equities: "[t]he greater the plaintiff's likelihood of success on the merits . . . the less harm from denial of the preliminary injunction the plaintiff need show in relation to the harm that the defendant will suffer if the preliminary injunction is granted."  *F.T.C. v. Elders Grain, Inc*., 868 F.2d 901, 903 (7th Cir. 1989); *OSF Healthcare Sys.,* 852 F.Supp.2d at 1094-95 (also utilizing the sliding-scale standard).  The inverse has also been adopted; where a defendant can demonstrate that a preliminary injunction would inflict "irreparable harm," a ruling

13

that a plaintiff would likely succeed on the merits is less probable.  *Elders Grain*,

868 F.2d at 903 ("[T]he sliding scale approach just sketched is appropriate . . . in

cases where defendants are able to show that a preliminary injunction would do

them irreparable harm.").  Because of this relationship, once a court has made a

determination of the likelihood of success, discussions on equitable considerations

are often scant.  *See OSF*, 852 F.Supp.2d at 1094-95; *Arch Coal*, 329 F.Supp.2d at

159-60.  However, as alluded to in the rationale above, there are several important

equitable considerations that merit further elucidation here.

### 1.    Hershey's Capacity Constraints

"The Supreme Court has not sanctioned the use of an efficiencies defense in

a case brought under Section 7 of the Clayton Act.  However, 'the trend among

lower courts is to recognize the defense.'"  *Arch Coal*, 329 F.Supp.2d at 150

(internal citations omitted) (quoting *Heinz*, 246 F.3d at 720); *see FTC v. Procter &*

*Gamble Co.*, 386 U.S. 568, 580 (1967) ("Possible economies cannot be used as a

defense to illegality.").  Here, the Hospitals have presented a compelling

efficiencies argument in support of the merger, in that the merger would alleviate

some of Hershey's capacity constraints.  As we have already found the merger to

be legal, this argument is not relevant as a defense to illegality.  However, the

efficiencies wrought by the merger would nonetheless provide beneficial effects to

the public, such that equitable considerations weigh in favor of denying the injunction.

Though the exact range is contested, both parties concur that a hospital's optimal occupancy rate is approximately 85%.[3]  During the evidentiary hearing on this matter, Ms. Sherry Kwater, former Chief Nursing Officer at Hershey Medical Center, testified extensively to her experience with the overcrowding and capacity problems rampant at Hershey.  (Tr., pp. 688-89).  Specifically, Ms. Kwater testified that the average capacity percentage at Hershey in the last several years had hovered at approximately 89% during the daily midnight census,[4] and routinely climbed to as high as 112-115% occupancy during midday.[5]  (Tr., p. 688).  Ms. Kwater also testified to a variety of ongoing renovation projects at Hershey designed to procure more beds, including those in the maternity ward and in the emergency room, as well as a project to convert a large storage room into space for observation beds.  (Tr., pp. 671-72, 675-76, 679, 685).  Ultimately, however, Hershey's Chief Executive Officer Craig Hillemeier and Chief Operating

---

[3]  (Doc. 96, p. 18 ("The consensus in medical literature is that a hospital's optimal occupancy rate is 80-85%.")); (Doc. 129, pp. 24-25).

[4]  Efficiencies expert Brandon Klar later testified that an occupancy review excluding the pediatric beds and focusing only on the remaining adult beds yielded a midnight occupancy rate averaging 90.5%.  (Tr., p. 737:25-738:1-7).

[5]  Ms. Kwater's testimony indicates that a hospital may be at over 100% capacity by placing patients in beds that were not designed for inpatient care.  (Tr., p. 689:3-6).  Obviously, this overcrowding results in negative consequences for patients at Hershey, who may not be comfortable placed in the hallway beds described, or 4- and 6- bedded rooms. (Tr., p. 684:17-23).

Officer Robin Wittenstein both testified that the renovation projects have not been sufficient to keep pace with the demand for care. (Tr., pp. 443:15-20; 579:12-19). Thus, without the merger, Hershey intends to build a new bed tower, costing approximately $277 million and generating 100 inpatient beds (yielding a total net gain of 70-80 new beds after renovations are complete). (Doc. 130, p. 21); (Tr., p. 579:12-19 ("[W]e will immediately begin moving forward on the construction of a new bed tower.")).

In response, the FTC assembled a series of arguments designed to rebut Hershey's stated need to build the bed tower. Evidence was introduced indicating that as few as two and as many as thirteen beds could alleviate Hershey's capacity constraints, and that Hershey would need a total of just thirty-six (36) beds in five years to relieve its capacity issues. (Doc. 129, p. 26). Under this reasoning, Plaintiffs suggest that Hershey would not need to build a bed tower at all. (*Id.*). Furthermore, Plaintiffs argue that even if it were built, Hershey has artificially inflated the cost of constructing the bed tower, and the cost would not ultimately be passed on to patients as the tower would be funded by grants or by existing funds in Hershey's fixed cost budget. (Tr., pp. 779-82, 989:4-8 ("Such a capital expense [as the building of a bed tower] . . . is properly understood as a fixed cost. As such, economic theory would not predict that it would be passed on in the form of higher prices.")).

This line of reasoning defies logic.  Even if the cost of the bed tower has been partially overstated, its construction would undoubtedly strain Hershey's financial resources, resulting in either increased charges for services or less investment in quality improvements.  (Doc. 130, p. 23 (citing to testimony by Defendants' expert economic witness, Dr. Willig)).  Both outcomes would negatively impact patients at least until the bed tower could be completed, fully paid for, and operational.  By contrast, the merger would immediately make additional capacity available to Hershey, causing near instantaneous benefits to Hershey's patients.  (*See* Tr., pp. 819:25-820:4 ("[T]he merger will immediately make more effective capacity available to alleviate Hershey's capacity problem. That's a relatively immediate, maybe instantly, but certainly within a few months, impact of the merger.")).

Further, for the Court to expect Hershey to rely on assumptions of grants for the construction would be to expect a reliance on unsound business practice, as the FTC has presented no evidence that such grants would definitively be forthcoming. (Tr., pp. 779:24-781:10 (cross examination of Brandon Klar, noting that the FTC's prediction of philanthropic donations is only assumed, and not guaranteed, and that donations for a bed-tower with no designated specialty like a children's ward or cancer facility are unlikely to accumulate in any great frequency)).

Finally, Plaintiffs impermissibly ask the Court to second guess Hershey's business decision in building the tower.  It is not within our purview to question the CEO and COO's determination of this need, and their sworn testimony that they will embark upon this project absent the merger is sufficiently reliable. Further, as our nation's population continues to age and increasingly demand more complex and numerous medical treatments, it is entirely reasonable that Hershey would decide that, absent a merger, construction of a large bed tower is in its best interest.

Hershey has also presented testimony of the capital avoidance that will occur if the combination with Pinnacle is allowed to go forward and the bed tower is not built.  Pinnacle has sufficient capacity available such that Hershey may transfer its lower-acuity patients to Pinnacle, simultaneously allowing both hospitals' physicians to treat more people while Hershey's capacity constraints are alleviated. (Tr., pp. 732-33, 748:13-18).  Further, Hershey's facilities will be able to admit more high-acuity patients who will benefit from Hershey's greater offering of complex treatments and procedures.  (*Id.* p. 737)[6]; (Doc. 96, p. 29).  Of course, the ability of both hospitals to treat more patients at the locations best suited to their

---

[6]  Here, Mr. Klar explained that "[site-of-service adjustments] will allow [Hershey] to reduce their occupancy rate . . . to 80 percent, which will allow space for patients that are currently being denied access within Central Pennsylvania to get the available access that they need locally and close to home." (Tr., p. 737:1-13).

healthcare needs will also generate more revenue.[7]   Finally, the merger will prevent

the outpouring of capital for the construction of the tower, allowing Hershey to

forego this expenditure, serve more patients, and generate downward pricing

pressure that greater efficiencies and a larger supply of services typically

facilitates.[8]

Where, as here, "an injunction would deny consumers the procompetitive

advantages of the merger," courts have found that the equities may weigh in favor

of allowing the combination to go forward.  *See Heinz*, 246 F.3d at 726-27 (citing

*FTC v. Pharmtech Research, Inc*., 576 F.Supp. 294, 299 (D.D.C. 1983)).  We find

---

[7]  This increase in revenue was discussed in detail during the Hospitals' testimony, and relates
primarily to a two-step savings process.  First, because Pinnacle handles on average, lower-
acuity care patients, there is an average price differential of $3,400 per case at Pinnacle as
compared to Hershey.  (Tr., p. 749:12-24).  This, multiplied by the expected 2,000-3,000 cases
that will be transferred over the next five years, yields a great deal of the expected savings,
between approximately $31.3 and $46.2 million.  (*Id*.).  Second, because the patients transferred
from Hershey to Pinnacle will be replaced by primarily higher-acuity care patients, the income
that Hershey will generate from providing their treatment will drastically increase, by as much as
$17,000 per case (Hershey stresses that other AMCs are routinely reimbursed at even higher
commercial rates for high-acuity care procedures—approximately 15 percent higher).  (*Id*., pp.
750:18-751:5).  This two-step increase in revenue was presented as one of the main reasons for
the Hospitals' desire to pursue the merger.  It was also cited as a reason for why the Hospitals
would have no need to impose a SSNIP on Harrisburg area payors, even if they could do so.
While we certainly acknowledge the merit of the efficiencies argument, we find this secondary
rationale regarding the SSNIP unpersuasive, as in the Court's experience it is rare that a
company decides it has made enough money already, such that it does not need more.  *See In the
Matter of ProMedica Health Sys., Inc*., Docket No. 9346, 2012 WL 2450574, at *21 (F.T.C.,
June 25, 2012) (describing the lower court's holding that the evidence did not support that
"excess hospital bed capacity in Toledo, repositioning by competitors, and steering patients away
from high-priced hospitals . . . would constrain post-Joinder price increases.").  Rather, it is for
the reasons discussed *supra* that we feel the Hospitals are unlikely to be able to unreasonably
raise costs for payors.

[8]  (Doc. 96, p. 29 (noting that the adjustments will save patients and payors $49.5-82.7 million
over five years); (Tr., pp.732-34 (same)).

that the efficiencies evidence overwhelmingly indicates that procompetitive advantages would be generated for the Hospitals' consumers such that the equities favor the denial of injunctive relief.

### 2. Repositioning by Competitors Will Constrain Hershey and Pinnacle

The 2010 *Horizontal Merger Guidelines* advise that "[i]n some cases, non-merging firms may be able to reposition . . . to offer close substitutes for the products offered by the merging firms."  2010 *Horizontal Merger Guidelines*, §6.1.  "A merger is unlikely to generate substantial unilateral price increases if non-merging parties offer very close substitutes."  *Id*.  Where, as here, firms are already present in the market but are repositioning, that "[r]epositioning . . . is evaluated much like entry, with consideration given to timeliness, likelihood, and sufficiency."  *Id*.  Courts weighing the anticompetitive effects of a merge have considered such repositioning as a factor in whether to give great weight to predictions of a combined entity's ability to control the marketplace.  *See ProMedica Health*, 2012 WL 2450574, *64-65 (discussing hospitals' competitors and concluding that they did not possess the significant competitive ability necessary to constrain the merged entity).

In the case *sub judice*, the market that Hershey and Pinnacle exist within has already been subject to extensive repositioning.  Competition, in the form of

nearby hospitals' growing ability to offer close substitutes for Hershey and

Pinnacles' advanced care, is escalating.  Specifically, Geisinger Health System

recently acquired Holy Spirit Hospital, with the intent to create a "regional referral

center and tertiary care hospital" (DX0090-002); WellSpan Health has acquired

Good Samaritan Hospital—with the specific goal of taking patients from Hershey

(DX 0095 ¶ 6; DX0851); the University of Pennsylvania partnered with Lancaster

General Hospital to "take more volume away from Hopkins, Hershey, and

Philadelphia competitors" (DX0136-232; *see also* DX0095 ¶ 7); and Community

Health Systems acquired Carlisle Regional Hospital.  (Tr., p. 80:23-25).  Notably,

this repositioning would not happen in response to the combination of Hershey and

Pinnacle—it has already occurred.  Thus, in terms of a timeliness and likelihood

analysis, there is no delay here that other courts have found to be a significant

concern in a competitor's ability to constrain a merged entity.  *ProMedica Health*,

2012 WL 2450574, *64-65 (expressing concern that a rival hospital, Mercy, had no

location chosen or deadline implemented for the construction of its outpatient

facility, which "casts doubt on whether Mercy is likely to accomplish such

repositioning and suggests that its . . . strategy will not provide a timely

constraint.").

Furthermore, this repositioning represents a direct and concerted effort to

erode both hospitals', but mainly Hershey's, patient base.  Far from being isolated

from service, other hospitals have realized and begun to capitalize on the large market of patients in the Harrisburg area.[9]  The Office of the Attorney General cites to these hospitals, not as small community hospitals, but as "dominant providers" that demand high prices for their services.  (Tr., p. 42:15-19).  It neglects, however, to emphasize that these providers are located in York, Lancaster, Reading and Danville[10]—well within driving distance from the "Harrisburg Area."  (Tr., p. 487:4-15).  Rather than monopolizing a geographic space, merging allows Hershey and Pinnacle to remain competitive in a climate where nearby hospitals are routinely partnering to assist each other in achieving growth and dominance.  The rival hospitals'' competitive strength will result in a meaningful constraint on competition, benefitting Harrisburg area residents in a manner consistent with the analysis set forth in the Guidelines.

### 3.    Risk-Based Contracting

Over the course of the five-day hearing, a substantial amount of testimony on the increase in risk-based contracting was presented.  Risk based contracting

---

[9] For example, Geisinger has already committed to invest $100 million in Holy Spirit to open a children's hospital and a Level II trauma center that Charles Chiampi, director of contracting for Highmark, submits shall directly compete with Hershey for complex emergency trauma care.  DX0095-0001, ¶ 5.  Further, the partnership between Geisinger and Holy Spirit allows for Geisinger to more easily refer higher-acuity patients from its Harrisburg location out to its larger facility in Danville.  (Tr. 938:16-939:7).

[10] (Tr., p. 42:15-19).  The Attorney General's Office simply cannot have its cake and eat it too.  These hospitals cannot both be examples of behemoth institutions that have negatively impacted the Central Pennsylvania patient base but also be too small to meaningfully compete with a combined Hershey and Pinnacle entity.

"begins to introduce new concepts and terms that begin to transfer the risk for the cost of care for the individual to the provider." (Tr., 493:18-25). Over the ensuing three years, the government and various private payors intend to evoke a shift towards risk-based forms of contracting, and the payors with which Hershey and Pinnacle contract are no exception. (Tr. 254:17-255:3; Tr., p. 939:19-21 ("these agreements . . . between the payers and the hospitals . . . include a strong mutual assurance of movement toward . . . risk-based forms of contracting, and framework for doing that cooperatively.")). In fact, the government intends to shift 50-80% of payments into risk based contracts by 2018. (Tr., p. 498: 6-14). In order to perform best under risk-based contracting, hospitals must offer a "total continuum of care." (Doc. 130, p. 30). Though we agree with the FTC that Hershey and Pinnacle independently are capable of continuing to operate under the risk-based model, we find the testimony of Hershey CEO Craig Hillemeier to be persuasive in that "there will be some advantages in terms of size of scale, in terms of being able to spread of costs [sic] of the infrastructure of population health over a larger health care system." (Tr. 445:21-446:4). This adaptation to risk-based contracting will have a beneficial impact. One persuasive benefit involves Hershey's ability to continue to use its revenue to operate its College of Medicine and draw high-quality medical students and professors into the region. (*Id.*, 448:13-15 ("[P]art of the purpose of the Medical Center is, indeed, to support the College of Medicine . .

. .  If patients don't fill the beds, then we can't do it.")).  Particularly as the

payment models continue to shift, the local populace has a continued interest in

seeing its most closely situated medical center remain competitive.

### 4.    Public Interest in Effective Enforcement of Antitrust Laws

"The principal public equity weighing in favor of issuance of preliminary

injunctive relief is the public interest in effective enforcement of the antitrust laws.

The Congress specifically had this public equity consideration in mind when it

enacted Section 13(b)."  *Heinz*, 246 F.3d at 726 (internal citations omitted).

However, where an injunction would deny consumers the procompetitive

advantages of the merger, this equity is no longer as compelling.  These advantages

have now been discussed at length, above.  Further, though the FTC is correct to

caution that "unscrambling" the assets of two merged entities is made more

difficult after the combination has been completed, *see F.T.C. v. Univ. Health, Inc.*,

938 F.2d 1206, 1216 n. 23 ("once an anticompetitive acquisition is consummated,

it is difficult to "unscramble the egg"), it is by no means unheard of that a merged

entity would be asked to divest the assets of the previously separate institution.

*See ProMedica Health*, 2012 WL 2450574, *66 ("Divestiture is the most

appropriate remedy to restore the competition eliminated by the Joinder.").

Further we note that the parties have not emphasized, and we do not credit,

any argument that "an injunction would 'kill this merger,'" as courts in the past

have found this line of reasoning to be unpersuasive and "at best a 'private' equity which does not affect [an] analysis of the impact on the market." *Heinz*, 246 F.3d at 726-27; *but see Freeman Hosp.*, 69 F.3d at 272 ("[A] district court may consider both public and private equities.").

After a thorough consideration of the equities in play, we find that the majority of these factors weigh in the public interest.  The patients of Hershey and Pinnacle stand to gain much from a combined entity that is capable of competing with a variety of other merged and already growing hospital systems in the region. This decision further recognizes a growing need for all those involved to adapt to an evolving landscape of healthcare that includes, among other changes, the institution of the Affordable Care Act, fluctuations in Medicare and Medicaid reimbursement, and the adoption of risk-based contracting.  Our determination reflects the healthcare world as it is, and not as the FTC wishes it to be.  We find it no small irony that the same federal government under which the FTC operates has created a climate that virtually compels institutions to seek alliances such as the Hospitals intend here.  Like the corner store, the community medical center is a charming but increasingly antiquated concept.  It is better for the people they treat that such hospitals unite and survive rather than remain divided and wither.

### III.    CONCLUSION

Based on the foregoing analysis, the Court finds that the FTC failed to meet its burden to show a likelihood of ultimate success on the merits of their antitrust claim against the Hospitals.  Accordingly, the Plaintiffs' Motion for a Preliminary Injunction shall be denied.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT**:

1.  The Plaintiffs' Motion for Preliminary Injunction (Doc.  82) is **DENIED**.


<u>s/ John E. Jones III</u>
John E. Jones III
United States District Judge